[No. A024988. First Dist., Div. One. Nov. 20, 1986.]

BOHEMIAN CLUB, Plaintiff and Appellant, v.
FAIR EMPLOYMENT AND HOUSING COMMISSION,
Defendant and Appellant.
DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING et al.,
Interveners and Appellants.

2

4

**COUNSEL**

William I. Edlund, Michael H. Salinsky, Kevin M. Fong and Pillsbury, Madison & Sutro for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, and Marian M. Johnston, Deputy Attorney General, for Defendant and Appellant.

Nancy L. Davis, Judith E. Kurtz, Terisa E. Chau and Shauna I. Marshall as Amici Curiae on behalf of Defendant and Appellant.

John P. Castello, Prudence Kay Poppink, Robert Barnes and Anne D. Brandon for Interveners and Appellants.

**OPINION**

**NEWSOM, J.**—The Department of Fair Employment and Housing (hereafter Department) filed an accusation against the Bohemian Club (hereafter Club) for alleged violations of the Fair Employment and Housing Act (hereafter FEHA). The accusation alleged that the Club, as an employer covered by the FEHA, had—in violation of the act—pursued a discriminatory hiring policy which systematically excluded women from all temporary and permanent jobs at its Monte Rio camp and most of such positions at its San Francisco location.

The Club denied that it is a covered employer, and, in the alternative, asserted that male gender is a bona fide occupational qualification. It also asserted that the FEHA is preempted by title VII of the 1964 Civil Rights Act (42 U.S.C. § 2000e) (Title VII), which does not include private clubs in its definition of employers subject to its antidiscrimination provisions.

The procedural background may be summarized as follows. An administrative law judge heard the case and ruled that male gender is a bona fide occupational qualification at the Club. The Fair Employment and Housing Commission (hereafter Commission) rejected the judge's findings and conclusions and issued its own findings and decision ordering the Club to institute an affirmative action program to employ women in both San Francisco and Monte Rio.

Pursuant to section 1094.5 of the Code of Civil Procedure, the Club filed a petition for a writ of mandamus in the superior court.

The petition did not name the Department and its director as real parties in interest; they, however, opposed the petition and filed their own petition in intervention to set aside the Commission's ruling purporting to deny classwide backpay. While the Commission agreed that the backpay ruling should be set aside, the trial court, in granting the Club's petition, denied the petition in intervention as moot.

On December 1 and 3, a hearing was held, after which the trial court issued a tentative ruling granting the Club's petition. In the aftermath of attendant publicity, the Commission learned for the first time that the trial judge had participated in the Club's activities, and the Commission's request that he disqualify himself was denied.

The Club's petition was granted. The trial court held that: (1) Title VII preempts the FEHA; and (2) even if the FEHA is not preempted, male gender is a bona fide occupational qualification. The court did not merely order the Commission to set aside its decision, but also dismissed the underlying accusation against the Club. While the Club was awarded costs, its cost bill was subsequently denied insofar as it claimed attorney's fees.

Both the Commission and the Department appealed.[1] The Club also appealed from the order denying it attorney's fees.

A review of the pertinent factual context reveals the following. The Bohemian Club is a distinguished private nonprofit association whose membership is limited to men professing devotion to the arts. It has a long and honorable history since its inception more than a century ago and it occupied an important place in the history of literature in early-day San Francisco. Its approximately 2,000 members are chosen by a highly selective process. Potential members are interviewed extensively and must be devoted to the arts, or willing to participate in artistic activities.

The Club's activities take place at two different locations: the City Club in San Francisco and the Grove, a 2,500-acre camping area near Monte Rio, California. Members attend concerts, theatrical and musical productions, oratorical presentations, lakeside talks and other functions.

The Club permanently employs 90 men in managerial, clerical, craft, food preparation and service, cleaning and personal service positions at its

---

[1] We will hereafter refer to the Commission and Department together as appellants.

San Francisco location. Women are employed in positions which do not require their presence at Club functions. In accordance with this policy, women work in accounting and administrative positions and at the print shop. Women also clean rooms and may be hired as food servers for members' private parties. At the Grove, a permanent work force of about 10 employees is maintained. These permanent staff members supervise a temporary work force of 250 men hired during the annual retreats at the Grove.

The Club's general manager testified that employees are primarily hired through union referrals and from the area around the Grove. When the union cannot provide an employee, the Club goes to the state employment department and sometimes even hires "off the street." Don Hiemforth, a member of the local Food Servers' Union, who has frequently worked at the Club, testified that, to his knowledge, referrals from the union have never been refused.

One waiter frequently employed at the Club testified concerning the Club's policy against fraternization between employees and members and guests. Waiters, for example, are not permitted to remain in the dining room at the City Club during the Thursday night club functions staged after dinner has been served. Such employees are strictly instructed to maintain relations with members at a minimal, exclusively business level.

Similar rules at the Grove prohibit fraternization between employees and members. The Club's general manager conceded that Grove employees are prohibited from fraternizing with members, and testified as well that employees are not permitted use of the swimming facilities.

The first legal question to be addressed in the present appeal is whether the Bohemian Club, as a private nonprofit corporation, is subject to the antidiscrimination provisions of the Fair Employment and Housing Act. (Gov. Code, § 12920 et seq.)

The Fair Employment and Housing Act is a comprehensive scheme for the realization of the state's public policy "to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgement on account of race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, sex, or age." (Gov. Code, § 12920.)

Under Government Code section 12926, subdivision (c), the term employer "does not include a religious association or corporation not organized for private profit." The Club accordingly contends that, as a nonprofit corporation, it is exempted from the antidiscrimination provisions of the FEHA. Appellants assert, however, that the word "religious" modifies both

"association" and "corporation not organized for private profit." (Gov. Code, § 12926, subd. (c).) Thus, under appellants' interpretation the exemption would only apply to the Club if it were a religious nonprofit corporation. The language at issue is ambiguous; it is not clear whether "religious" only modifies "association" or whether it also refers to a nonprofit corporation. This ambiguity is resolved, however, by a review of the pertinent legislative history. (*Sand* v. *Superior Court* (1983) 34 Cal.3d 567, 570 [194 Cal.Rptr. 480, 668 P.2d 787].)

When Government Code section 12926, subdivision (c) was originally enacted, the term employer did not "include a social club, fraternal, charitable, educational or religious association or corporation not organized for private profit." (Lab. Code, § 1413, subd. (d).) Under the amended version, however, the Legislature deleted social clubs, as well as fraternal, charitable, and educational organizations from the statutory exemption. "Where the amendment of a statute consists of the deletion of an express provision, the presumption is that a substantial change in the law was intended." (*Subsequent Injuries Fund* v. *Industrial Acc. Com.* (1963) 59 Cal.2d 842, 844 [31 Cal.Rptr. 477, 382 P.2d 597] citing *Clements* v. *T. R. Bechtel Co.* (1954) 43 Cal.2d 227, 231 [273 P.2d 5]; see also *Longshore* v. *County of Ventura* (1979) 25 Cal.3d 14, 26 [157 Cal.Rptr. 706, 598 P.2d 866]; *Ladd* v. *Board of Trustees* (1972) 23 Cal.App.3d 984, 990 [100 Cal.Rptr. 571].)

By specifically deleting "social clubs" from the statutory exemption, it appears that the Legislature no longer wished to afford such entities an exemption from the nondiscrimination policies of the FEHA. Moreover, the deletion of charitable organizations, which are by nature nonprofit, clearly indicates that the term religious was intended to modify both "association" and "corporation not organized for private profit." Had the Legislature simply intended, as respondent suggests, to exempt all nonprofit corporations, it seems unlikely that it would have deleted charitable organizations from the exemption provision. In any event, we conclude that the adjective "religious" must be read as modifying both "association" and "corporation not organized for private profit." And, upon this reading of the statute, we conclude that only religious associations or nonprofit corporations are exempt from the antidiscrimination provisions of FEHA, and that appellants do not fall within this exempt category.[2]

---

[2]The Club relies on *Isbister* v. *Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72 [219 Cal.Rptr. 150, 707 P.2d 212] for the proposition that nonprofit corporations are not considered employers under the FEHA. In *Isbister,* the Boys' Club argued that the FEHA contained an express exemption for "'association[s] or corporation[s] not organized for private profit'" and that "by excluding 'nonprofit' groups from the housing and employment laws, the Legislature demonstrated its intent that the phrase 'business establishments,' as used in the

Appellants assert that the trial court was limited to determining whether substantial evidence supported the Commission's findings, and that it erred in using the independent judgment standard of review.

■ Section 1094.5 of the Code of Civil Procedure authorizes judicial review of administrative decisions. When it is claimed that the administrative findings are not supported by the evidence, "the statute contemplates that the court will apply either the independent judgment test or the substantial evidence test . . . ." (*Kerrigan* v. *Fair Employment Practice Com.* (1979) 91 Cal.App.3d 43, 48 [154 Cal.Rptr. 29].) "[I]f the order or decision of the agency substantially affects a fundamental vested right, the court, in determining under section 1094.5 of the Code of Civil Procedure whether there has been an abuse of discretion because the findings are not supported by the evidence, must exercise its independent judgment on the evidence and find an abuse of discretion if the findings are not supported by the weight of the evidence. If, on the other hand, the order or decision does not substantially affect a fundamental vested right, the trial court's inquiry will be limited to a determination of whether or not the findings are supported by substantial evidence in light of the whole record." (*Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 44-45 [112 Cal.Rptr. 805, 520 P.2d 29].) "Whether an administrative decision substantially affects a fundamental, vested right so as to require independent judgment review must be decided on a case-by-case basis." (*Kerrigan* v. *Fair Employment Practice Com., supra,* 91 Cal.App.3d at p. 49.)

The Club contends that "it is the constitutional right of every person to close his . . . club to any person . . . ." (*Bell* v. *Maryland* (1964) 378 U.S. 226, 313 [12 L.Ed.2d 822, 848, 84 S.Ct. 1814]), and that accordingly, the forced hiring of women would violate the Club members' right of freedom of association, a fundamental right triggering the independent judgment test.

In *Adcock* v. *Board of Education* (1973) 10 Cal.3d 60 [109 Cal.Rptr. 676, 513 P.2d 900], our high court stated that it is "essential to adopt a special rule or standard to review administrative decisions when constitu-

---

Unruh Act, should have a strictly commercial meaning." (*Id.,* at p. 83.)

The court rejected this contention and cited the FEHA's express provision that "'nothing contained in this part shall be construed, *in any manner or way,* to limit or restrict the application of Section 51 of the Civil Code [i.e., the Unruh Act].'" (*Id.,* at p. 84.) Thus, the court did *not* interpret the FEHA's exemption provision. And significantly, the exemption provision was only quoted in part; the word "religious," which precedes, and thus modifies, "association and corporation not organized for private profit," was omitted. It is thus clear that our high court did not address the question here at issue—namely, whether the legislative history of the FEHA indicates an intent to exempt a private social club, which also happens to be a nonprofit corporation, from the act's antidiscrimination provisions.

tional rights are assertedly limited. [Citations.]" (*Id.,* at pp. 65-66; see also *Kerrigan* v. *Fair Employment Practice Com., supra,* 91 Cal.App.3d at p. 52; *Franklin* v. *Leland Stanford Junior University* (1985) 172 Cal.App.3d 322, 330-331 [218 Cal.Rptr. 228].) Because the protected constitutional right of free speech was manifestly implicated in *Adcock,* the court concluded that the independent judgment test was the proper standard of review. (10 Cal.3d at p. 69.)

██ For reasons we will discuss at length later in this opinion, we find in the present record that such associational or privacy interests of members as are implicated do not rise to the level of fundamental vested interests for which an independent judicial evaluation and judgment are traditionally required. We conclude, on the contrary, that the conventional substantial evidence test was the proper standard for the trial court's review of the administrative record.[3,4]

Among the Club's principal substantive contentions is that the forced hiring of women violates members' constitutional right of association; therefore, it is argued the FEHA's inclusion of private clubs in its antidiscrimination provisions is unconstitutional. In so arguing, the Club relies on the following language from *Gilmore* v. *City of Montgomery* (1974) 417 U.S. 556 [41 L.Ed.2d 304, 94 S.Ct. 2416]: "'The associational rights which our system honors permit all white, all black, all brown, and all yellow clubs to be formed. . . . Government may not tell a man or woman who his or her associates must be. The individual can be as selective as he desires.'" (*Id.,* at p. 575 [41 L.Ed.2d at p. 320]; quoting *Moose Lodge No. 107* v. *Irvis* (1972) 407 U.S. 163, 179-180 [32 L.Ed.2d 627, 641, 92 S.Ct. 1965] (dis. opn. of Douglas, J.) The Club also directs us to the following language of our Supreme Court: "[p]rejudice and bigotry in any form are regrettable . . . [although] it is the constitutional right of every person to close his home or club to any person . . ." (*Bell* v. *Maryland, supra,* 378 U.S. 226, 313 [12 L.Ed.2d 822, 848] (conc. opn. of Goldberg, J.).)

Quite apart from the fact that *Gilmore* and related cases—unlike the case at bench—involve the relationship of member to member and not member

---

[3]We will add, however, that our conclusions on the substantive issues presented in this appeal do not depend upon which standard of review should have been employed by the trial court. As will be apparent, given the state of the evidence we are able to resolve such issues as a matter of law and without regard to whether the trial court was obliged to limit its review by the substantial evidence rule or free to exercise its independent judgment.

[4]As was said in *Guesby* v. *Kennedy* (D.Kan. 1984) 580 F.Supp. 1280, "We believe that in the context of an employment relationship, the scope of the right of association is much more limited than in the context of membership in an organization." (*Id.,* at p. 1284.)

to employee, these sweeping statements have been significantly modified by subsequent decisions of our high court. In *Roberts* v. *United States Jaycees* (1984) 468 U.S. 609 [82 L.Ed.2d 462, 104 S.Ct. 3244], in upholding the application of a Minnesota human rights statute compelling the Jaycees to accept women as full voting members, the court flatly rejected the Jaycees' claim that the inclusion of women would violate their right to freedom of association, observing that the Constitution protected only "intimate" and "expressive" associational rights. ■ The first aspect of associational freedom protects "the formation and preservation of certain kinds of highly personal relationships . . . ." (*Id.,* at p. 618 [82 L.Ed.2d at p. 471].) An individual's choice "to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." (*Id.,* at pp. 617-618 [82 L.Ed.2d at p. 471].) The second aspect of associational freedom encompasses an individual's "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties." (*Id.,* at p. 618 [82 L.Ed.2d at p. 471].)

Because the Jaycees did not have selective membership standards, the only criteria being age and sex, the court found that no "intimate" associational rights would be infringed by the inclusion of women as full voting members. (*Id.,* at p. 621 [82 L.Ed.2d at p. 473].) The *Roberts* court also rejected the Jaycees' claim that their right of "expressive" association would be violated by the inclusion of women. While recognizing that the Jaycees dominant purpose had been to further the social and political views of young *men,* the court refused to entertain what it termed "stereotypical" assumptions that the presence of women members would thwart or stultify these "expressive" activities necessary to implementing that purpose. (*Roberts* v. *United States Jaycees, supra,* 468 U.S. at p. 628 [82 L.Ed.2d at p. 479].)

It bears repetition that we are of course confronted here with the impact of women *employees* upon the Club, and nothing in the discussion which now follows bears upon the wholly separate issue of women as *members.* And, in assessing this impact, our first inquiry is whether hiring females would unduly interfere with the Club's "intimate" associational rights under *Roberts.*[5] ■ Also, in determining the intimacy of a relationship, and

---

[5]Our high court held that "even if enforcement of the Act cause[d] some incidental abridgement of the Jaycees' protected speech, that effect is no greater than is necessary to accomplish the State's legitimate purposes." (*Roberts* v. *United States Jaycees, supra,* 468 U.S. at p. 628 [82 L.Ed.2d at p. 478].)

the corresponding entitlement to protection from state intrusion, pertinent factors we should consider include: "size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." (*Id.*, at p. 620 [82 L.Ed.2d at p. 473].)

■ As we have said, the Club's membership consists of approximately 2,000 men whose common purpose is to enjoy the arts in an atmosphere of male camaraderie. But while the Club's membership policy is extremely selective, and the consequent relationship among members is undoubtedly "intimate" in associational terms, the same cannot be said for the associational rights of members vis à vis employees. As the Club's manager testified, little is known concerning employees at hiring. Such testimony was corroborated by a member of the local food servers union who declared that, to his knowledge, the Club had never refused anybody referred by the union. In short, the record amply demonstrates that the Club's hiring procedure is not selective.

We are obliged to carefully consider as well whether the Club's purposes of promoting male fellowship and appreciation of the arts would be undermined by hiring female employees in selective capacities. In this respect, it seems highly relevant that, according to the Club's manager, employees are prohibited from fraternizing with the members. It is difficult to understand how, for example, the presence of women cooks or food servers would inhibit realization of the Club's purposes in view of this nonfraternization rule. Indeed, the existence of that rule renders implausible any assertion that the Club's "intimate" associational rights would be infringed by hiring female employees. Nothing in the present record demonstrates that the members have so "highly personal a relationship" with employees as to warrant protection from state intrusion.

■ The Club nevertheless contends that the mere presence of women on a regular basis "would change the spirit of the organization" and would "destroy the Bohemian feeling." The eminent author and editor, William F. Buckley, Jr.—himself a Bohemian—testified that the presence of women employees at the Grove "would make so critical a difference as far as I can see that I would certainly forfeit my sense of allegiance to it."[6] Such feelings—however sensitive and genuine—are not afforded constitutional protection, however, for—we repeat—the right to freedom of association only protects "highly personal" relationships (*Roberts* v. *United States Jaycees*,

---

[6]It may be observed that, as the record here shows, during World War II the Club employed women without apparent damage to its tradition.

*supra,* 468 U.S. at p. 618 [82 L.Ed.2d at p. 471]),[7] and the Club members' relationship with employees cannot reasonably be termed "intimate" within the letter or spirit of the high court's careful exegesis of that term.

The Club makes a corollary contention that hiring women employees would violate its *privacy* rights, citing *White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222], for the proposition that " '[t]he right of privacy . . . [encompasses the] freedom to *associate* with the people we choose.' " (*Id.,* at p. 774); as we have already said, however, *Roberts* v. *United States Jaycees, supra,* 468 U.S. 609, establishes the rule that the constitutional right of association protects only "intimate" relationships, while here members' relationships with employees are neither "highly personal" nor "intimate."

 Even were we to assume arguendo that the members' associational rights would somehow be constricted by the Club's forced hiring of women, we think such infringement would be justified by the state's compelling interest in eradicating employment discrimination. Again we are guided by high authority. In *Hishon* v. *King & Spalding* (1984) 467 U.S. 69 [81 L.Ed.2d 59, 104 S.Ct. 2229], plaintiff asserted that she had been unlawfully denied partnership status in a law firm on the basis of sex. The Supreme Court found that plaintiff had stated a cognizable claim under Title VII and rejected the law firm's claim of infringement of its associational rights, stating: " '[I]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections.' " (*Id.,* at p. 78 [81 L.Ed.2d at pp. 68-69].) In a concurring opinion, Justice Powell noted that laws barring discrimination may well infringe first amendment rights: "The court's opinion properly reminds us that 'invidious private discrimination . . . has never been accorded affirmative constitutional protections.' . . . This is not to say, however, that enforcement of laws that ban discrimination will always be without cost to other values, including constitutional rights. Such laws may impede the exercise of personal judgment in choosing one's associates or colleagues." (*Id.,* at p. 80, fn. 4 [81 L.Ed.2d at p. 70].) We read *Hishon* as authority for the proposition that the impact, if any, of forced hiring of female employees on Club members' associational rights could be justified by the state's compelling interest in eliminating employment discrimination.

The Club also asserts that the Fair Employment and Housing Act's inclusion of private clubs within its antidiscrimination provisions is incon-

---

[7]We need not address the question of whether the Club's "expressive" right of association would be infringed because the thrust of the Club's argument is that the presence of women would destroy the intimate all-male atmosphere.

sistent with, and thus superseded by, Title VII, which in section 701, subdivision (b) specifically exempts private clubs from its antidiscrimination strictures.[8]

In deciding whether a federal law preempts a state statute, "[o]ur task is 'to determine whether, under the circumstances of this particular case, [the State's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" (*Jones* v. *Rath Packing Co.* (1977) 430 U.S. 519, 526 [51 L.Ed.2d 604, 614, 97 S.Ct. 1305].) The United States Supreme Court has repeatedly stated that "[c]ongress enacted Title VII to assure equality of employment opportunities without distinction with respect to race, color, religion, sex, or national origin." (*Kremer* v. *Chemical Construction Corp.* (1982) 456 U.S. 461, 468 [72 L.Ed.2d 262, 272, 102 S.Ct. 1883], citing *Alexander* v. *Gardner-Denver Co.* (1974) 415 U.S. 36, 44 [39 L.Ed.2d 147, 155, 94 S.Ct. 1011] and *McDonnell Douglas Corp.* v. *Green* (1973) 411 U.S. 792, 800 [36 L.Ed.2d 668, 676-677, 93 S.Ct. 1817].) With these principles in mind, we examine the question of whether the FEHA is preempted by Title VII.

As the Club observes, the private club exemption in Title VII was, in the words of Senator Humphrey, designed to protect "the genuine privacy of private clubs or other establishments whose membership is genuinely selective on some reasonable basis." (110 Cong.Rec. (June 13, 1964) 13697.)[9] Accordingly, the Club argues, under section 1104 of Title XI, a preemption provision of the Civil Rights Act, the FEHA's inclusion of private clubs is fatally inconsistent with Title VII and cannot stand. Section 1104 provides: "[N]othing contained in any title of this Act shall be construed as indicating an intent on the part of Congress to occupy the field in which any such title operates to the exclusion of State laws on the same subject matter, nor shall any provision of this Act be construed as invalidating any provision of State law unless such provision is *inconsistent* with any of the purposes of this Act, or any provision thereof." (42 U.S.C. § 2000h-4.) (Italics added.)

The Club also cites *Kemerer* v. *Davis* (E.D. Mich. 1981) 520 F.Supp. 256, for the proposition that application of antidiscrimination legislation to

---

[8]Section 701, subdivision (b) of Title VII provides that the term "employer" does not include "a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of the Internal Revenue Code of 1954 . . . ." (42 U.S.C. § 2000e(b).)

[9]See also *EEOC* v. *St. Joseph Hospital East Inc.* (W.D. Tenn. 1979) 19 F.E.P. 1439, 1440 ("The legislative history of Title VII rather clearly indicates that Congress drafted § 701(b) to preserve social and fraternal organizations of self-controlled membership as a refuge for private associational values."); *Fesel* v. *Masonic Home of Delaware, Inc.* (D.Del. 1977) 428 F.Supp. 573, 577 ("In Title II, Congress sought to preserve a small non-commercial enclave for the unfettered exercise of the freedom of association . . . .")

private clubs is inconsistent with Title VII. In *Kemerer,* the court held that the application of the Civil Rights Act of 1866 (42 U.S.C. § 1981) to the employment practices of a private club would conflict with section 701, subdivision (b) of Title VII. The court stated: "If applied literally, 1981 would reach within private establishments protected by the 1964 Act; the two statutes, thus, are in conflict." (*Id.,* at p. 258.) The court concluded that private clubs were impliedly exempted from the provisions of 1981 by virtue of the conflicting and therefore superseding exemption set forth in Title VII. (*Id.,* at p. 260.) (See also *Hudson* v. *Charlotte Country Club, Inc.* (W.D.N.C. 1982) 535 F.Supp. 313, 317.)[10]

*Kemerer* involved two *federal* statutes, however. In *Kremer* v. *Chemical Construction Corp.* (1981) 456 U.S. 461 [72 L.Ed.2d 262, 102 S.Ct. 1883], the court discussed the relationship between two federal statutes and observed that "whenever possible, statutes should be read consistently." (*Id.,* at p. 468 [72 L.Ed.2d at p. 271].) This was accomplished in *Kemerer* by finding the earlier federal statute preempted by the later, thereby effectively incorporating a subsequently enacted exemption into the 1866 Civil Rights Act. (See also *Hunter* v. *Erickson* (1969) 393 U.S. 385, 388 [21 L.Ed.2d 616, 620, 89 S.Ct. 557].) The question presented here, however, is whether *states* have the power to enact broader antidiscrimination legislation than that provided by Title VII.

In arguing that the states retain such power, appellants rely on section 708, the "savings" clause of Title VII, which provides as follows: "[n]othing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State of political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter."

 In *Shaw* v. *Delta Air Lines, Inc.* (1983) 463 U.S. 85 [77 L.Ed.2d 490, 103 S.Ct. 2890], our nation's high court said of section 708: ". . . Title VII does not itself prevent States from extending their nondiscrimination laws to areas not covered by Title VII, see § 708, 78 Stat. 262, 42 USC § 2000e-7 . . . . Quite simply, Title VII is neutral on the subject of all employment practices it does not prohibit." (*Id.,* at p. 103 [72 L.Ed.2d at p. 505].) Thus, states may extend "their nondiscrimination laws to areas not covered by Title VII . . . ." (*Ibid.*) In Government Code section 12926, subdivision (c), California's Act extends its nondiscrimination policies to

---

[10]For a contrary view, see *Guesby* v. *Kennedy, supra,* 580 F.Supp. 1280, 1286, where the court held that Title VII's private club exemption does not apply to section 1981 actions.

private clubs, an area not covered by Title VII, a result section 708, as interpreted in *Shaw,* permits.

A number of cases have interpreted section 708 as preserving state laws which further Title VII's objective of eliminating employment discrimination. In *Grann* v. *City of Madison* (7th Cir. 1984) 738 F.2d 786, for example, the court held that section 708 was designed to save state laws which are "consistent with the goals of Title VII while invalidating those that hindered protection of civil rights." (*Id.,* at p. 792.) The court also noted that section 1104, the preemption provision upon which the Club relies, "should not be construed to undermine state efforts [in eliminating employment discrimination.]" (*Id.,* at p. 791.)

We find further support for appellants' position in *Thomas Pub. Co.* v. *Division of Human Rights* (S.D.N.Y. 1978) 456 F.Supp. 1104, rejecting the argument that Title VII preempted New York's Human Rights Law and holding that "even if the Human Rights Law and Title VII of the Civil Rights Act were inconsistent with respect to pregnancy disability benefits, this inconsistency would not be of a nature requiring supersedure or preemption of the state law by federal law." (*Id.,* at p. 1108.) The court concluded that the Human Rights Law in no way interfered with Title VII's purpose of eliminating employment discrimination and hence was not subject to preemption. (*Ibid.*) And in *Local 246, Util. Wkrs. U.* v. *Southern California Edison Co.* (C.D.Cal. 1970) 320 F.Supp. 1262, 1264, it was held that the purpose of section 1104, the preemption provision, and section 708, the "savings" clause, "is to insure preservation of state laws which parallel the Federal Act in prohibiting employment discrimination, such as California's recently amended Fair Employment Practices Act."

We similarly find that, even though the FEHA's inclusion of private clubs may be facially inconsistent with Title VII, the inconsistency is not "of a nature requiring supersedure or preemption of the state law by federal law." (*Thomas Pub. Co.* v. *Division of Human Rights, supra,* 456 F.Supp. at p. 1108.) The inclusion of private clubs in no way hinders Title VII's overriding objective of eliminating employment discrimination. Contrary to the Club's simplistic interpretation of section 1104, the term "inconsistent" must be interpreted by focusing primarily upon whether a law furthers Title VII's goal of eliminating employment discrimination. Laws which *hinder* the protection of civil rights are inconsistent with Title VII's purpose, and thus subject to preemption. (*Grann* v. *City of Madison, supra,* 738 F.2d at p. 792.)

In our view, the fact that Congress has acted to limit the scope of federal regulation does not necessarily indicate an intent to preempt a state's

exercise of its police power. As our high court has stated: "[T]he intent to supersede the exercise by the State of its police power as to matters not covered by the Federal legislation is not to be inferred from the mere fact that Congress has seen fit to circumscribe its regulation and to occupy a limited field." (*Savage* v. *Jones* (1912) 225 U.S. 501, 533 [56 L.Ed. 1182, 1195, 32 S.Ct. 715]; see also *Florida Avocado Growers* v. *Paul* (1963) 373 U.S. 132, 146 [10 L.Ed.2d 248, 259, 83 S.Ct. 1210].) In the area of discrimination, the police power of states to regulate private discrimination has often been sustained despite lack of federal coverage of such discrimination, either by congressional choice or constitutional limitation. In *Moose Lodge No. 107* v. *Irvis, supra,* 407 U.S. 163, for example, the court held that the equal protection clause could not be invoked to prohibit the discriminatory actions by a private club which held a state liquor license. In contrast, in *Roberts* v. *United States Jaycees, supra,* 468 U.S. 609, the *state's* right to regulate discrimination in a private club's membership selection was upheld.

Appellants contend, and we agree, that limited federal regulation of discrimination does not necessarily indicate a congressional intent to preempt state laws with broader antidiscrimination provisions. We subscribe to the view that congressional *reluctance* to extend coverage of this antidiscrimination law to private clubs acting as employers is not a *purpose* of the statute. And as one commentator in the field has succinctly said, ". . . congressional concern . . . [over] congressional refusal to extend a federal statute to include particular entities is hardly a prohibition of the states doing so." (Garcia, *Title VII Does Not Preempt State Regulation of Private Club Employment Practices* (1983) 34 Hastings L.J. 1107, 1130.)

■■■■ We follow the authority of the United States Supreme Court: "Quite simply, Title VII is neutral on the subject of all employment practices it does not prohibit." *Shaw* v. *Delta Airlines, supra,* 463 U.S. at p. 103 [77 L.Ed.2d at p. 505]. Because states can extend antidiscrimination laws to areas not covered by Title VII, we conclude that the FEHA is not preempted by Title VII.[11] (*Ibid.*)

Another of the Club's key contentions is that male gender is a bona fide occupational qualification for Club employees which justifies its exclusion of female employees.

---

[11]The Club further contends that the state may not exercise its police power to regulate private discrimination when such regulations are inconsistent with the purpose of federal law. This contention, however, is subsumed within the general question of whether Title VII preempts the Fair Employment and Housing Act and accordingly, need not be separately addressed.

██ The Fair Employment and Housing Act provides that a discriminatory employment practice is *not* unlawful if it is based upon a "bona fide occupational qualification" (hereafter BFOQ). (Gov. Code, § 12940.) At the same time, however, the availability of a BFOQ defense is "an extremely narrow exception to the general prohibition of discrimination on the basis of sex." (*Dothard* v. *Rawlinson* (1977) 433 U.S. 321, 334 [53 L.Ed.2d 786, 800, 97 S.Ct. 2720]; see also *County of Alameda* v. *Fair Employment & Housing Com.* (1984) 153 Cal.App.3d 499, 506 [200 Cal.Rptr. 381]; *Long* v. *State Personnel Bd.* (1974) 41 Cal.App.3d 1000, 1016 [116 Cal.Rptr. 562].) Hence, "the principle of nondiscrimination requires . . . that in order to rely on the bona fide occupational qualification exception an employer has the burden of proving that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved." (*Weeks* v. *Southern Bell Telephone & Telegraph Company* (5th Cir. 1969) 408 F.2d 228, 235; see also *Usery* v. *Tamiami Trail Tours, Inc.* (5th Cir. 1976) 531 F.2d 224, 228 fn. 10.) Even if an employer can demonstrate that certain jobs require members of one sex, the employer must also "bear the burden of proving that because of the nature of the operation of the business they could not rearrange job responsibilities . . ." in order to reduce the BFOQ necessity. (*Hardin* v. *Stynchcomb* (11th Cir. 1982) 691 F.2d 1364, 1370-1371; see also *Gunther* v. *Iowa State Men's Reform.* (8th Cir. 1980) 612 F.2d 1079, 1086, cert. den. (1980) 446 U.S. 966 [64 L.Ed.2d 825, 100 S.Ct. 2942].

██ The Fair Employment and Housing Commission has interpreted the BFOQ defense in a manner incorporating all of the federal requirements necessary for its establishment. Under the Commission's regulations: "Where an employer or other covered entity has a practice which on its face excludes an entire group of individuals on a basis enumerated in the Act (*e.g.,* all women or all individuals with lower back defects), the employer or other covered entity must prove that the practice is justified because all or substantially all of the excluded individuals are unable to safely and efficiently perform the job in question and because the essence of the business operation would otherwise be undermined." (Cal. Admin. Code, tit. 2, § 7286.7, subd. (a)).

"(a) Among situations which will not justify the application of the BFOQ defense are the following:

"(1) . . . . . . . . . . . . . . . . . . . .

"(2) . . . . . . . . . . . . . . . . . . . .

"(3) Customer preference for employees of one sex;

"(4) The necessity for providing separate facilities for one sex; or

"(5) The fact that members of one sex have traditionally been hired to perform the particular type of job.

"(b) Personal privacy considerations may justify a BFOQ only where:

"(1) The job requires an employee to observe other individuals in a state of nudity or to conduct body searches, and

"(2) It would be offensive to prevailing social standards to have an individual of the opposite sex present, and

"(3) It is detrimental to the mental or physical welfare of individuals being observed or searched to have an individual of the opposite sex present.

"(c) Employers or other covered entities shall assign job duties and make other reasonable accommodation so as to minimize the number of jobs for which sex is a BFOQ." (Cal. Admin. Code, tit. 2, § 7290.8).

The standards of the Commission are thus seen to be in harmony with federal law regarding the availability of a BFOQ defense. And, as the Commission correctly observes, its interpretation of the act it enforces is entitled to great respect. *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 491 [156 Cal.Rptr. 14, 595 P.2d 592]; *Dermegerdich* v. *Rank* (1984) 151 Cal.App.3d 848, 851 [199 Cal.Rptr. 30].

The Club argues that the presence of women employees would undermine the essence of its business operation, and that, accordingly, male gender is a valid BFOQ under the FEHA. The Club cites the following testimony in support of its contention that the presence of women would destroy the essence or character of its operations. In the words of former Governor Edmund G. Brown: "[W]hat really is important is the spirit of camaraderie, the male camaraderie where men get together and they are free of the element of the battle of the sexes or the competition or distraction of having the other sex present. It is a single-sex gathering, and that is a very special thing." Yet another member commented: "It is a social experience, the kind that this particular club seeks to provide you, that requires a total affinity of gender. People do behave differently where there are women . . . It's an argument that when there are women waitresses, the situation alters. And it would certainly alter in the dining circle or in the auditorium or anywhere

else in that camp."[12] Other testimony, however, indicated that the Club had never received complaints about one of the Club's long-standing female employees, Ms. Lily Lum, who works as a food server during lunch at the City Club. Two cases cited by appellants, *Diaz* v. *Pan Am. World Airways, Inc.* (5th Cir. 1971) 442 F.2d 385, cert. den. (1971) 404 U.S. 950 [30 L.Ed.2d 267, 92 S.Ct. 275], and *Fernandez* v. *Wynn Oil Co.* (9th Cir. 1981) 653 F.2d 1273, refute the Club's legal contention that customer preference can form the basis of a BFOQ defense.

In *Diaz,* an employer attempted to justify its exclusion of male flight attendants by claiming that female flight attendants provided a more pleasant environment. Despite evidence produced by the airlines that passengers overwhelmingly preferred female flight attendants, the court rejected the BFOQ defense, explaining: "We do not feel this alone justifies discriminating against all males. . . . Before sex discrimination can be practiced, it must not only be shown that it is impracticable to find the men that possess the abilities that most women possess, but that the abilities are *necessary* to the business, not merely tangential." (442 F.2d 385, 388-389.) Thus, because the essence of the airline's business was the safe transport of passengers, and the pleasant atmosphere created by female flight attendants was merely tangential thereto, the court concluded that female gender was not a BFOQ (*Id.,* at p. 389.)

In *Fernandez,* the court again rejected a BFOQ defense, in the face of evidence which showed that South American customers might refuse to deal with women. The court found "no *factual* basis for linking sex with job performance." (653 F.2d 1273, 1276; italics added.) Customer preference was considered irrelevant because a woman could perform the job as readily as a man. Both *Fernandez* and *Diaz* stand for the proposition that BFOQ defenses cannot be established on the basis of stereotypical gender-based assumptions.

In the case at bench, the evidence overwhelmingly establishes that club members prefer male employees. The preference is presumably based upon assumptions concerning the inhibiting effect women employees might have upon men. These are, however, mere stereotypical assumptions, lacking in any factual basis. Moreover, because of the nonfraternization policy and lack of selectivity in hiring employees, such male fellowship as might exist between club members and employees is clearly in a legal sense tangential. (*Diaz* v. *Pan Am. World Airways, Inc., supra,* 442 F.2d at pp. 388-389.)

---

[12]We intend no denigration of the sincerity or accuracy of such sentiments. They are, however, to be measured against the countervailing constitutional rights of persons to be free from invidious discrimination in hiring.

The trial court erred in disregarding the principles laid down in *Fernandez* and *Diaz* as inapposite for the reason that, in its view, those cases dealt with *commercial* enterprises. That the Club is a private club does not exempt it from high legal authority which unequivocally declares that employment decisions cannot be predicated upon "stereotyped characterizations of the sexes." (*Dothard* v. *Rawlinson, supra,* 433 U.S. at p. 333 [53 L.Ed.2d at p. 800]; see also *City of Los Angeles Dept. of Water & Power* v. *Manhart* (1978) 435 U.S. 702, 707 [55 L.Ed.2d 657, 664-665, 98 S.Ct. 1370], on remand 577 F.2d 98; *Rosenfeld* v. *Southern Pacific Company* (9th Cir. 1971) 444 F.2d 1219, 1224-1225; *Thorne* v. *City of El Segundo* (9th Cir. 1983) 726 F.2d 459, 468, cert. den. 469 U.S. 979 [83 L.Ed.2d 315, 105 S.Ct. 380].) As an employer subject to the provisions of the FEHA, the Club must abide by the same rules which govern all California employers.

As we have already said, while the relationship among Club members is certainly not commercial, that between employees and members can be described as almost exclusively commercial in nature. Employees are hired "sight-unseen" through union referrals. As earlier noted, the Club's own manager testified that very little is known about employees when they are hired. Most positions do not require written applications. The parties, in fact, stipulated that applications, when required, ask for only minimal personal information, and the only selection criteria in the hiring process are gender and the appearance of ability to do the job. At Monte Rio, employees are hired as seasonal laborers. The relationship between members and employees can fairly be described as transitory and business-like, rather than intimate.

The Club also contends that its members' privacy interests establish a BFOQ, noting that many shower and bathroom facilities are unenclosed and that members walk about the camp in various states of undress. Claims of a BFOQ based on privacy interests have been upheld if the job actually requires the employee to carry out such intimate duties. (*Fesel* v. *Masonic Home of Del., Inc.* (D.Del. 1978) 447 F.Supp. 1346, affd. (3d Cir. 1979) 591 F.2d 1334.)

Club members' privacy interests, however, need not be threatened because enclosed shower and bathroom facilities are available. If a member chooses not to use the enclosed facilities, no legally enforceable right of privacy is impaired. Thus, in *Forts* v. *Ward* (2d Cir. 1980) 621 F.2d 1210, 1217, the court ordered shower screens and sleeping garments for prison inmates, refusing to hold that the inmates' privacy interests encompassed a preference for sleeping nude, when such preference would eliminate equal

employment opportunities for male guards. Similarly, Club members' privacy interests do not encompass a legally protectible right to use unenclosed bathroom or shower facilities.

In sum, *Diaz* and *Fernandez* establish that customer preference cannot form the basis of a BFOQ defense. Finding the reasoning of these authorities persuasive, and for all of the reasons we have stated, we also conclude that male gender is not a BFOQ for Club employees.

Two remaining issues require only brief discussion.

First is the Club's contention that, in finding appellants' conduct arbitrary and capricious, the trial court bound itself to award the Club attorney fees under Government Code section 800, and erred in refusing such fees. We disagree, first, because the word "may" in section 800 indicates that the award is discretionary (*Fair* v. *Hernandez* (1981) 116 Cal.App.3d 868, 876 [172 Cal.Rptr. 379]) and second, because the court also—and we think correctly—concluded that "the case involve[d] . . . novel and complicated issues . . ." and that it was a "bona fide legal dispute of great importance . . . ."

Finally, we are asked by appellants to permit correction of errors contained in the petition on intervention. For the following reasons we agree.

The instant case was initiated by the Director of the Department of Fair Employment and Housing, who filed a complaint authorized by Government Code section 12960. The Director then issued an accusation based on the complaint, which challenged the Club's practices of excluding female employees. The complaint and accusation therein did not name any women as parties or seek backpay on their behalf.

The Commission, while the case was pending before it, received a class action notice, in a *separate* complaint filed against the Club by one Carol Esses, a woman who had been denied employment by the Club. Carol Esses' complaint was mistakenly included in the record of the instant case. When ruling on this case, the Commission also ruled on the Esses complaint and denied an award of backpay.

The portions of the Commission's decision which denied backpay to members of Carol Esses' class action complaint were challenged in the petition in intervention. The Commission agrees that it had no authority to decide issues not raised in a pending case and which concern persons who are not parties.

Under the Administrative Procedure Act, the Commission is only empowered to hold a hearing and issue a decision when an accusation, based upon a complaint, is pending before the agency. (Gov. Code, §§ 11503 and 12967.) Since no accusation was ever filed on the Esses complaint, the Commission lacked authority to decide the issues it raises. The case is accordingly remanded to the Commission for rectification. (*Department of Alcoholic Bev. Control* v. *Alcoholic Bev. etc. Appeals Bd.* (1981) 118 Cal.App.3d 720, 727 [173 Cal.Rptr. 582]; *Flaherty* v. *Board of Retirement* (1961) 198 Cal.App.2d 397, 406 [18 Cal.Rptr. 256].)

That part of the judgment denying the Club attorney's fees is affirmed. In all other respects the judgment is reversed with directions to the trial court to reinstate the Commission's findings. The parties shall bear their own costs.[13]

Racanelli, P. J., and Holmdahl, J., concurred.

The petition of plaintiff and appellant for review by the Supreme Court was denied February 26, 1987.

---

[13]This judgment is no way precludes the Club from attempting to demonstrate that male gender is a BFOQ for particular employment positions.