[No. G031750. Fourth Dist., Div. Three. Mar. 3, 2003.]

THE PEOPLE ex rel. JOE KERR et al., Plaintiffs and Respondents, v.
COUNTY OF ORANGE, Defendant and Appellant;
WILLIAM CAMPBELL, Intervener and Appellant.

## COUNSEL

Benjamin P. deMayo, County Counsel, Marianne Van Riper, Jeffrey M. Richard and Nicole A. Sims, Deputy County Counsel, for Defendant and Appellant.

Law Offices of Philip B. Greer and Phillip B. Greer for Intervener and Appellant William Campbell and for Foothill Homeowners Association as Amicus Curiae on behalf of Defendant and Appellant.

Ruth Sorensen for California State Association of Counties as Amicus Curiae on behalf of Defendant and Appellant.

JoAnne Speers for League of California Cities as Amicus Curiae on behalf of Defendant and Appellant.

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Steven L. Mayer and Richard C. Jacobs for El Toro Reuse Planning Authority as Amicus Curiae on behalf of Defendant and Appellant.

Paul, Hastings, Janofsky & Walker, Stephen L. Berry and Kenneth P. White for Orange County Business Council as Amicus Curiae on behalf of Defendant and Appellant.

Bill Lockyer, Attorney General, Andrea Lynn Hoch, Chief Assistant Attorney General, Louis R. Mauro, Assistant Attorney General, David M. Verhey, Deputy Attorney General; Morrison & Foerster, Dean J. Zipser, Vikki L. Vander Woude, Adina L. Witzling, Michael Feuer and Benjamin J. Fox for Plaintiffs and Respondents.

OPINION

SILLS, P. J.—

## I. *Introduction*

The majority of California's 58 counties do not have charters. In those counties, the structure of county government is laid out in various statutes enacted by the Legislature and found in the state Government Code. Thirteen counties, not counting Orange County, do have charters, in which the structure of county government is provided for in the charter itself, subject to certain restrictions in the California Constitution and state statutes.

Orange County is the 14th county with its own charter. However, its charter, adopted with the passage of Measure V in the March 2002 Primary Election, is atypical. It is very short—so short, in fact, that we can quote all of it in a single footnote.[1] Its brevity is the result of a wholesale incorporation of the general laws of the State of California except as otherwise

---

[1]Here is the full text of the charter, taken straight from the ballot materials, though we have scrunched it up by combining paragraphs:
"ARTICLE I - BOARD OF SUPERVISORS [¶] 101. Governing Body [¶] 102. Terms of Office [¶] 103. Filling of Vacancies [¶] ARTICLE II - GENERAL [¶] 201. Initiative and Referenda [¶] 202. General Law Governs [¶] 203. County Ordinances Enacted by the Voters Remain in Effect [¶] PREAMBLE [¶] We, the citizens of Orange County, with a desire for self-determination in selecting our county elected officials and to initiate the process to govern our county by charter government, do hereby adopt this charter. [¶] ARTICLE I - BOARD OF SUPERVISORS [¶] 101. Governing Body. [¶] The governing body of the county is a Board of Supervisors of five (5) members elected by and from designated supervisorial districts. [¶] 102. Terms of Office. [¶] The term of the office of supervisor is four (4) years. [¶] 103. Filling of Vacancies. [¶] Notwithstanding any other provision of law, .whenever a vacancy occurs in the office of supervisor, the vacancy shall be filled as follows: [¶] A. If the vacancy occurs in the first 1095 days of the term of office, the vacancy shall be filled by a vote of the electors of that district at a special election to be called by the Board of Supervisors not less than 56 days nor more than 70 days after the vacancy occurs. If the vacancy occurs within 180 days of a regularly scheduled election held throughout the supervisorial district, the election to fill the vacancy may be consolidated with that regularly scheduled election. [¶] The person receiving the highest number of votes in that election shall fill the vacancy. [¶] B. If the vacancy occurs within the final year of the term, the vacancy shall be filled by the person receiving the highest number of votes for supervisor in that district in the March primary election that year. If that person for any reason does not assume

expressly provided for by the charter, and the charter has only one provision deviating from the general laws of California—the manner of filling a vacancy in the county board of supervisors. Without this charter, the Governor would fill any vacancy. (Gov. Code, § 25060 ["Whenever a vacancy occurs in any board of supervisors, the Governor shall fill the vacancy. The appointee shall hold office until the election and qualification of his successor."].) Under the new charter enacted by Measure V, the voters in the supervisorial district elect the replacement, either (depending on the time) at a special election or at an upcoming general election.

A group of citizens have now challenged Measure V, seeking to invalidate it on the theory that it is unconstitutional, or, if constitutional, on the theory that it was misleadingly described in the ballot materials. Their arguments fall into four major categories:

(1) Measure V does not literally comply with the provision of the state Constitution, article XI, section 4, that prescribes what a county charter must contain.[2]

(2) Measure V is substantively inconsistent with the idea of county home rule because it cedes various aspects of local government to the Legislature through the incorporation of the state's general law into the charter.

(3) The voters were given a misleading or defective description of the charter by the county's official lawyer, the county counsel, in the impartial analysis sent to the voters.

(4) The voters should have been given a fiscal impact statement as well as a description of the charter in their ballot materials. (See Elec. Code, § 9160.)

---

the office for the remainder of the term, the Board of Supervisors is hereby authorized to appoint a person to fill the vacancy. If the Board of Supervisors does not make such an appointment within 30 days following the certification of the March primary election results or following the failure of that person to assume the office, whichever comes later, the Board of Supervisors shall call a special election to be held not less than 56 nor more than 70 days thereafter to fill the vacancy. The person receiving the highest number of votes in that special election shall fill the vacancy. [¶] ARTICLE II - GENERAL [¶] 201. Initiative and Referenda. [¶] This charter does not abridge or modify the rights of citizens to propose initiatives and referenda (including amendments to this charter) as provided for in the general laws of the State of California. [¶] 202. General Law Governs. [¶] Except as expressly set forth in this charter, the general law set forth in the Constitution of the State of California and the laws of the State of California shall govern the operations of the County of Orange. [¶] 203. County Ordinances Enacted by the Voters Remain in Effect. [¶] Ordinances of the County of Orange adopted by the voters prior to the enactment of this charter shall remain in full force and effect any may only be modified or repealed by a vote of the people."

[2]All references in this opinion to Article XI, or to section 4 or section 7 1/2 or to a given subdivision are to the California state Constitution.

As explained in more detail below, none of these arguments is persuasive. The charter *does* literally comply with Article XI, section 4, because by incorporating the general law of California it *provides for* each of the requirements in that constitutional provision. And, there is nothing inherently inconsistent with home rule in the idea of county voters *choosing* to have most of the rules of county government made by the Legislature: If that, paradoxically, is the home choice, so be it. It isn't for the courts to take *that right* away from the county voters. In fact, as we show below, this charter actually facilitates home rule because it gives the voters the right to change rules made by the Legislature in the future, something they would not have without a charter. Indeed, merely by choosing a charter form, Orange County gained significant flexibility in dealing with future contingencies.

Further, California election law does not allow a litigant to contest an election on the theory that a 500-word impartial analysis was deficient. The reality of this case is that plaintiffs have tried to do exactly that—undo an election by critiquing the impartial analysis provided with the ballot materials. While case law does allow the possibility that an impartial analysis can be so misleading and inaccurate that constitutional due process requires invalidation of the election, any alleged deficiencies in the county counsel's impartial analysis in this case come nowhere near to implicating any constitutional concerns.

Finally, the inclusion of a fiscal impact statement is clearly a discretionary matter under the terms of the relevant statute, and the board here was well within its discretion not to include one.

## II. *The Passage of the Measure, the Litigation, and the Subsequent Election*

The idea of a charter to allow the county voters to decide on any vacancies was first proposed to the Orange County Board of Supervisors in late May 2001, and by July 2001, the board voted to put Measure V on the March 2002 ballot. The measure passed by a 52.8 percent to 47.2 percent margin in the March 2002 election, becoming effective on filing with the Secretary of State in April.

In September 2002, plaintiffs in this case filed, in their own names, a petition for a writ of mandate in the superior court seeking an injunction commanding the county not to enforce Measure V on the ground it was unconstitutional. The county filed a demurrer in October. In November

plaintiffs responded with a complaint in "quo warranto"—hence the "People ex rel." in the caption.[3]

Also, after one of the five members of the board of supervisors was elected to the state Assembly in November, he resigned, and the remaining members of the board set January 28, 2003 as the date of a special election to fill the ensuing vacancy. The setting of the election prompted plaintiffs to seek an early hearing on a request for a preliminary injunction to stop the election. They got their early hearing date, which was December 19, 2002.

The preliminary injunction was denied, but the trial judge did decide to move the case along so that a full trial could be completed by January 28, 2003. He set January 21, 2003, the Tuesday a week before the scheduled election, as the day to begin trial. During the month of January the lawyers on both sides filed, on an almost daily basis, a great deal of paperwork with the court (briefs on various issues, motions in limine, requests for judicial notice, objections, that sort of thing). Trial consumed four days (Jan. 21-24), ending on Friday, January 24.

On Saturday, January 25—during the last weekend before the election— the trial court issued an 18-page written "minute" order concluding that Measure V was unconstitutional on the grounds of substantive (as distinct from literal) noncompliance with the state Constitution, and failure of the county counsel's impartial analysis to explain to the voters its full ramifications. Given the impending election, the trial court's solution was to issue an injunction which allowed the election to go forward, but not have the votes counted.

Within hours on that Saturday this court stayed that order. ▮ Because the trial court's minute order contemplated an immediate judgment in conformance with the minute order, we have deemed the minute order to incorporate such a judgment, a procedural device which allows appellate courts to expedite a case. (See *Francis v. Dun & Bradstreet, Inc.* (1992) 3 Cal.App.4th 535, 539 [4 Cal.Rptr.2d 361] [construing unappealable minute order to incorporate an appealable judgment so as to avoid delay].) Plaintiffs then filed a formal request with this court asking that the election be put off

---

[3] "Quo warranto" comes from an ancient writ used in Great Britain where the king (especially Edward I) tested the validity of claims or franchises claimed by subjects from the Crown. Thus it is tailor-made for legal inquiries as to the validity of a county charter. For more detail on quo warranto proceedings, see *International Assn. of Fire Fighters v. City of Oakland* (1985) 174 Cal.App.3d 687 [220 Cal.Rptr. 256]. Today, most states, including California, require a plaintiff to obtain permission from the state attorney general to seek the writ. (E.g., Code Civ. Proc., § 803.)

pending appellate review of the proceedings. That request was denied, but plaintiffs were given an expedited briefing schedule so the appellate hearing could take place within the month. The election went forward, and William Campbell, who is also an intervener in these proceedings, won, and has since taken office.

The election was not meaningless in any event. As plaintiffs themselves acknowledged in requesting that this court stay the election, even if it were later determined that the winner had no right to hold office in the aftermath of his winning the election, the winner's actions in office could not be legally challenged or undone. (*In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21, 42 [37 Cal.Rptr. 74, 389 P.2d 538].)

While plaintiffs asserted (in their request that this court stay the election) that the litigation would dampen the turnout, that was only a matter of speculation. Indeed, the ensuing publicity might have increased it. We will never know.

Moreover, to the degree that plaintiffs' concern might have been correct, plaintiffs have only themselves to blame. They might have brought their action sooner and moved it to trial sooner. In fact, they could have brought their action even before Measure V was passed in March 2002. Thus it is not surprising that included in the blizzard of papers that were filed with the trial court in the month before trial was Campbell's request that the case be dismissed because plaintiffs had waited too long to bring their challenge. While they certainly had the *right* to bring a constitutional challenge to the statute when they did, the fact that the litigation coincided with the election, and may have put a cloud on the actual election itself, is a matter of plaintiffs' own doing.

One more word is in order about the timing before we address the merits of the case: Superficially, it might *look* as if the trial court dallied on the case, waiting until the Saturday before the election to issue its order declaring Measure V unconstitutional, and thereby preventing an appellate court from reviewing the decision in any detail before the election. We are forced to disagree. We have outlined the chronology of the case in some detail in these past few pages to demonstrate that the trial judge made the best of the situation he was handed, and the timing problems were attributable to plaintiffs, who waited until the last opportune moment to challenge the measure. The case could have been filed much earlier than September 2002, plaintiffs could have received permission from the Attorney General's Office earlier to sue in the name of the People, and the case didn't need to sit around from September to late December—but none of that was the trial

judge's fault. When the trial court got the case it was tried and heard within the month, and the trial court issued an 18-page judicial decision within a day of the completion of the trial. By judicial standards (remember that judges have, by law, 90 days to make rulings in cases submitted to them) this was a remarkable accomplishment, and it was no doubt reflected in a number of late nights and much hard work put into the case by the trial judge. Even though, as we are about to explain, the trial judge came to erroneous conclusions, he cannot be faulted in his management of the case. (Perhaps a full trial wasn't needed, and the matter could have been handled on papers alone, but even here all you can say is that the trial judge erred on the side of letting each side have its day in court, which is hardly a bad thing.) All in all, Judge Banks showed diligence above the call of duty in tackling the case and bringing it to completion with the speed he did.

## III. *Measure V Literally Complies with the State Constitution*

■ We first address the contention that Measure V does not conform to the requirements of the state Constitution for county charters. This was *not* one of the bases of the trial judge's decision, but the issue is still pressed by the plaintiffs.

Those requirements are set forth in Article XI, section 4. The provision begins with the words "County charters shall provide for:" and then lists a series of six subdivisions, (a) through (f), which enumerate various structural aspects of county government, which, in shorthand, might be paraphrased as: having a governing body; the compensation, terms and removal of members of that governing body; having elected sheriffs, district attorneys, assessors and other officers; doing the things that state statutes require counties to do; the various powers and duties of county agencies and officers; and county employers generally.

The last two subdivisions of Article XI, section 4, subdivisions (g) and (h), do not contain any specifications as to what a charter must provide, but make general statements about counties with charters and how the law operates as to them. Subdivision (g) states essentially that when a county has a charter, its charter provisions override state law to the degree that charters are "competent" to do so and not otherwise precluded by the state Constitution. Subdivision (h) states that charter counties have "all the powers" that noncharter counties have, i.e., a county doesn't *lose* the right to do anything it otherwise has the right to do if it has a charter.

Measure V incorporates by reference, wholesale, the provisions of "the general law set forth in the Constitution of the State of California and the

laws of the State of California." The legal question before us is whether, by so doing, it "provides for" the various requirements specified in Article XI, section 4, subdivisions (a) through (f). If we take them one by one, we see that applicable general law, as it stands today (and on election day in Mar. 2002) *provides for* each of the requirements of Article XI, section 4:

Subdivision (a): "A governing body of 5 or more members, elected (1) by district or, (2) at large, or (3) at large, with a requirement that they reside in a district."

Applicable general law: Government Code sections 23005 ("A county may exercise its powers only through the board of supervisors . . . ."); 25000 ("Each county shall have a board of supervisors consisting of five members."); 25040 ("Each member of the board of supervisors shall be elected by the district which he represents, and not at large, except in any county in which supervisorial districts have not been established by law or ordinance . . . ."); 25200 ("The board of supervisors may divide the county into . . . supervisorial districts").[4]

Subdivision (b): "The compensation, terms, and removal of members of the governing body."

Applicable general law: Government Code sections 25300 ("The board of supervisors shall prescribe the compensation of all county officers and shall provide for the number, compensation, tenure, appointment and conditions of employment of county employees."); 25000 ("the term of office of each member shall be four years"); 3000 (forfeiture of office upon conviction of designated crimes); 3001 (intoxication while in discharge of duties of office); 3060 et seq. (corruption in office).

Subdivision (c): "An elected sheriff, an elected district attorney, an elected assessor, other officers, their election or appointment, compensation, terms and removal."

Applicable general law: Government Code sections 24000 (listing various officers as "officers of a county," including sheriff, district attorney, and assessor); 24009 (unless voters approve a proposal to make the positions appointed, "the county officers to be elected by the people are the treasurer, county clerk, auditor, sheriff, tax collector, district attorney, recorder, assessor, public administrator, and coroner"); 24200 (all elected county officers

---

[4]We do not necessarily determine that the statutes which we adduce in support of the idea that each of the requirements of Article XI, section 4 has been met by the incorporation of state law are exhaustive. But there are enough statutes as to each item to demonstrate that the various provisions which Article XI, section 4 says must be included in the charter have indeed been included.

are elected at the general election when the Governor is elected and take office on a certain day in the succeeding January); 24201 (elected county officers hold office until successors are elected or appointed and qualified); 25300 ("The board of supervisors shall prescribe the compensation of all county officers and shall provide for the number, compensation, tenure, appointment and conditions of employment of county employees."); 3000 (forfeiture of office upon conviction of designated crimes); 3001 (intoxication while in discharge of duties of office); 3060 et seq. (corruption in office).

Subdivision (d): "The performance of functions required by statute."

Applicable general law: Actually, on this one, Measure V's own incorporation clause itself satisfies the requirement, as it says that the county will do what statutes require it to do, hence it provides for the performance of those functions. That might sound a little circular, but actually no other conclusion makes sense. The alternative is to read Article XI, section 4, subdivision (d) to require that a county charter literally have a section saying that the county will do all the functions required in myriad statutes, and then list all those functions one by one. That would be a herculean task for any county counsel, and of course it would be easy to overlook some function somewhere required of counties in some obscure statute. General incorporation of statute law solves the problem rather elegantly.

Subdivision (e): "The powers and duties of governing bodies and all other county officers, and for consolidation and segregation of county officers, and for the manner of filling all vacancies occurring therein."

Applicable general law: Government Code sections 24300 (listing various combinations of county offices which may be consolidated); 24301 (allowing board of supervisors to separate duties in consolidated offices); 24303 (providing for filling of offices when board omits to consolidate duties as otherwise authorized); 24202 and 24203 (when various supervisors are to be elected); 25000 et seq. (organization of board of supervisors);[5] 26500 et seq. (powers and duties of district attorney); 26600 (powers and duties of sheriff).

Subdivision (f): "The fixing and regulation by governing bodies, by ordinance, of the appointment and number of assistants, deputies, clerks, attaches, and other persons to be employed, and for the prescribing and regulating by such bodies of the powers, duties, qualifications, and compensation of such persons, the times at which, and terms for which they shall be appointed, and the manner of their appointment and removal."

[5]Government Code section 25060, providing for the Governor to fill vacancies, is obviously not part of what was incorporated in Measure V.

Applicable general law: Government Code sections 24101 ("Every county or district officer, except a supervisor or judicial officer, may appoint as many deputies as are necessary for the prompt and faithful discharge of the duties of his office."); 24102 (procedures for appointment of deputies); 24103 (requirement that deputies be citizens of the state); 24105 (provision for filling vacancies in the various offices listed in section 24000).

It should be apparent from the foregoing recitation that Measure V *literally* complied with Article XI, section 4, because the incorporation of general state law "provided for" the various procedural rules required by that constitutional provision. (Accord, *Brown v. Francisco* (1954) 123 Cal.App.2d 413, 417 [266 P.2d 951] [holding that charter provision governing salaries of members of board of supervisors by incorporating general law by reference complied with constitutional requirement that charters provide for compensation of boards of supervisors].) We need only make one additional observation with regard to any contention that Measure V doesn't literally comply with Article XI, section 4: From relatively early days in the history of county charter jurisprudence, the idea of filling in a gap left by the terms of a county charter with the applicable provision of general law has been approved by our Supreme Court. (See *Cline v. Lewis* (1917) 175 Cal. 315, 318 [165 P. 915] [looking to general state law to ascertain when a particular ordinance governing the pay of the county sheriff was to take effect].)

The principle is nicely illustrated in *Jones v. De Shields* (1921) 187 Cal. 331 [202 P. 137]. There, a county charter made no provision for a deputy county clerk to be paid. In analyzing whether the clerk could be paid, our Supreme Court examined in detail the language in what might be called the "inconsistency" clause in the predecessor to Article XI, section 4, subdivision (g), which was former Article XI, section 7 1/2. As worded, the clause provided that those laws which it is "competent" to put into a charter "and for which provision is made" in a charter, would "supersede all laws inconsistent with such charter relative to the matters provided in such charter." Parsing this language, the Supreme Court concluded that it meant that if a charter left something out, general law would fill the gap. "These provisions contemplate that there may be a case where a charter will fail to provide for matters which it properly should cover, and the intention is clear that in such a situation the general law, which in such a case has not been superseded by the charter, shall govern." (*De Shields, supra,* 187 Cal. at p. 336, citing *Cline v. Lewis, supra,* 175 Cal. at p. 316.)

While the inconsistency clause of former Article XI, section 7 1/2, now found in Article XI, section 4, subdivision (g) has been cleaned up a little

since *De Shields* was decided, the key ideas as divined by the *De Shields* court still remain. Subdivision (g) still operates as a kind of computer default program to fill in gaps which the authors of a charter might omit or forget. The ideas of a charter superseding laws which the charter is both competent to make "and for which provision is made" in the charter are still there. (Subdivision (g) reads in total: "Whenever any county has framed and adopted a charter, and the same shall have been approved by the Legislature as herein provided, the general laws adopted by the Legislature in pursuance of Section 1(b) of this article, shall, as to such county, be superseded by said charter as to matters for which, under this section it is competent to make provision in such charter, and for which provision is made therein, except as herein otherwise expressly provided.")

The upshot of *De Shields* and *Cline* is that general law can be used to fill in gaps in what a charter doesn't expressly provide for. In fact, as plaintiffs recognize, county charters have been upheld a number of times when they didn't literally provide for some mechanism required by the Constitution. (See *Nicholl v. San Francisco* (1927) 201 Cal. 470 [257 P. 501] [charter forgot to provide for retirement for probation officers, still upheld]; *Hafliger v. County of Sacramento* (1950) 97 Cal.App.2d 850 [218 P.2d 993] [charter omitted mechanism for filing claims, still upheld]; *McPherson v. Richards* (1933) 134 Cal.App. 462 [25 P.2d 534] [charter omitted salary for assistant district attorney, still upheld].) If county charters will be upheld when they haven't literally provided for all the mechanisms and structures required by the state Constitution, they most certainly should be upheld when they do.

## IV. *Measure V Substantively Complies with the State Constitution*

The trial court did not peg its decision on literal noncompliance, perhaps because, as we have just shown, the measure does literally comply with the state Constitution's requirements for charters. Rather, the trial judge concluded that the measure was unconstitutional primarily based on what he concluded was its substantive noncompliance with Article XI, section 4.

In a word, he thought that the measure just plain gave too much power to the Legislature in Sacramento to be called "home rule." Thus he wrote: "The problem with Measure V is that it fails to substantially comply with the requirements of Article XI Section 4 of the California Constitution. It does not provide for all the items required (beyond the election of supervisors and filling their vacancies) but instead makes the County *subservient* to the will of the State Legislature via the adoption of general law in all other aspects. This is not substantial compliance with Article XI Section 4." (Italics added.)

Throughout his minute order the trial judge specifically relied on only one decision, *Reuter v. Board of Supervisors* (1934) 220 Cal. 314 [30 P.2d 417] (*Reuter*) to support his conclusion. Referring to *Reuter* (or, more precisely, a passage from *Dibb v. County of San Diego* (1994) 8 Cal.4th 1200, 1215 [36 Cal.Rptr.2d 55, 884 P.2d 1003] (*Dibb*), which discussed *Reuter*), the judge wrote that "To paraphrase the Supreme Court: if the general laws controlled the Orange County Charter provisions of all the matters contained in Article XI Sections 4(b), (c), (d), (e) and (f) relating to the various subjects, powers and duties contained therein, then the *thrust* of the provision for establishment of powers and duties and functions through the county charter would be defeated. The Supreme Court said it best and it deserves repeating: 'We did not think the framers of the amendment, nor the people of the state who ratified it, contemplated any such absurd result.'" (Italics added.)

The passage concerning "absurd" results which the Supreme Court said "best" was from *Reuter, supra,* 220 Cal. at page 321. The trial judge would again return to the theme of "thrust" in yet another passage, again citing the *Reuter* case: "The court in <u>Reuter v. Board of Supervisors</u> 220 Cal 314 expressly held that if general law controls the charter's provision of powers and duties relating to county officers, then the thrust of the provision for establishment of powers and duties through the county charter would be defeated. The court in <u>Reuter</u> stated that a re-enactment through the charter process of the powers and duties of county officials set forth in the general law would be a mere superfluous or idle act."

Because reliance on the *Reuter* case is the foundation of the trial court's decision, we will now examine that decision in detail.[6] Given the incredible time pressure and hurry under which the case was brought to trial and within

---

[6]At oral argument counsel for plaintiffs was challenged to identify plaintiffs' best case supporting the proposition that Orange County's charter did not comply with the requirements of Article XI, section 4. Surprisingly, he did not name *Reuter,* the case which clearly had most influenced the trial judge, but *People v. County of Santa Clara* (1951) 37 Cal.2d 335 [231 P.2d 826] (a case which was not mentioned in the respondents' brief, but only in the respondents' consolidated response to the various amicus curiae briefs filed in support of the county's position). *County of Santa Clara* (which we will refer to as the *Levin* case), however, is completely off point. In *Levin,* something that resembled a proposed charter for Santa Clara County was published in the San Jose Mercury Herald before the election. Former Article XI, section 7 1/2 required that a charter be "published for at least 10 times in a daily newspaper of general circulation." However, in *Levin,* the *correct* text of the charter was published only five times; the other five times it was "garbled" by printer's errors, so much so that the high court would later describe those versions as "unintelligible." (See *Levin, supra,* 37 Cal.2d at p. 341.) The first part of the *Levin* opinion showed that the legislative resolution approving the charter was not conclusive. (See *id.* at pp. 337-339.) The second part described the printers' errors (essentially mixing up blocks of text and putting them where they weren't supposed to be) to show that the publication on the five incorrect days conveyed "an erroneous impression." (*Id.* at pp. 340-341.) After that, the ending of the opinion was extraordinarily short:

which the trial court had to issue its ruling, it is not surprising that the trial judge misread the *Reuter* case, but it is clear that misread it he did.

To reiterate, *Reuter* essentially is an exploration of the inconsistency or "state law controls" clause in former section 7 1/2 of Article XI. Members of San Mateo's board of supervisors tried to divest themselves of their duties as road commissioners for their respective districts. It sounds strange as we write in the early 21st century, but back in 1933 general state laws made each member of a county board of supervisors the ex officio road commissioner of his or her district; the supervisor's duties included taking charge of the highways in the district and employing "all men, teams, watering cars and all help necessary to do the work in the district when the same is not let by contract." (*Reuter, supra*, 220 Cal. at p. 319, citing former Pol. Code §§ 2641, 2645, & 4041.7.) The plaintiff in *Reuter*, who appears to have been a disgruntled taxpayer, wanted to keep it that way in the face of a new county ordinance giving responsibility for roads to the county engineer.

San Mateo was by then a charter county, and the Supreme Court noticed that its new ordinance delegating the duties otherwise held by each board member individually over roads to the new county engineer was "in direct conflict" with the general state law. (See *Reuter, supra*, 220 Cal. at p. 319.) The disgruntled taxpayer pointed to language in the inconsistency clause in former section 7 1/2 of Article XI, which said that provisions of county charters "relating to the powers and duties of boards of supervisors and all other county officers shall be subject to and controlled by general laws." (See *Reuter, supra*, 220 Cal. at p. 320, quoting former Art. XI, § 7 1/2.)

But the same section 7 1/2 also said that a county charter was "competent" to provide for " 'the powers and duties of boards of supervisors.' " (*Reuter, supra*, 220 Cal. at p. 320.) Our high court was thus, in the *Reuter* case, forced to deal with a *contradiction in the state Constitution itself* and the question of what to do about it. After all, if the Constitution allowed a county charter to fix the powers and duties of the board of supervisors, but at the same time said that those powers and duties were "controlled" by general state law, then what happens when the charter fixes duties in "direct conflict" with the general law?

The *Reuter* court's solution was to first expose the absurdity of the internal contradiction, and then ignore the language which seemed to *require*

---

"While substantial compliance has been held to suffice under some circumstances [citations] such compliance, as above indicated, is not present in this case." (*Id.* at pp. 341-342.) Since we determine that Orange County's charter *does* "substantially" comply with Article XI, section 4, *Levin* is of only academic interest. *Levin* merely stands for the proposition that if the Constitution requires publication of a charter 10 times before an election, publication of a correct version five times and a garbled version five times is not substantial compliance with that requirement.

that charter provisions " 'relating to the powers and duties of boards of supervisors and all other county officers shall be subject to and controlled by general laws,' " because not ignoring it would lead to an "absurd result." (*Reuter, supra*, 220 Cal. at pp. 320-321.) To simplify the analysis in what is a relatively difficult, rather redundant, and hard-to-follow passage in *Reuter* (consisting of one very long paragraph spanning pages 320 through 321 in the official reporter),[7] the court essentially said if general law were to control the powers and duties of boards of supervisors, then the other constitutional provision saying that county charters were competent to fix the powers and duties of boards of supervisors would only be calling for "idle," "useless," and "superfluous and idle" acts.

Well, said the court, no one contemplated that sort of absurdity when they framed and enacted the 1911 amendment to the state Constitution allowing for county charters. Accordingly, it was permissible for San Mateo to provide for fewer duties for the board of supervisors than general law did.

The *Reuter* court then augmented its absurdity conclusion with a host of other reasons to *uphold* the charter, not strike it down. First, it buttressed its conclusion by reiterating the general rule against constructions that lead to absurd results. (*Reuter, supra*, 220 Cal. at p. 321.) Next it adduced the general rule that a proviso (specifically the general-law-controls language) which is "repugnant" to the "body of the act" will be ignored (*id*. at pp. 321-322), which the court was going to do (*id*. at p. 322).

---

[7]It is not an example of our high court's clearest prose. Just so readers can see for themselves whether our translation is true to the original, we reproduce the subject paragraph here. The court had just quoted language from former section 7 1/2 which said charters were competent to provide "[f]or the powers and duties of boards of supervisors . . . ." and then launched into this discussion:

"From a mere reading of this provision of the constitutional section it is apparent that the proviso contained therein is inconsistent with and repugnant to the general provision of that portion of the section of which it is a part. The general provision of the section provides that it shall be competent in all charters framed under said section of the Constitution, and 'the same shall provide' for the powers and duties of boards of supervisors and of all county officers. At the time of the adoption of said constitutional amendment the general laws of the state, with meticulous care, had fixed and defined the powers and duties of the board of supervisors and of each and every county officer in the state, except those acting under a city and county government, with which we are not here concerned. Therefore, if the powers and duties of boards of supervisors and county officers, as fixed by the charter, are 'subject to and controlled by general laws', then any attempt to provide for such powers and duties in the charter would be an idle act and a useless expenditure of effort. If these powers and duties as fixed by the charter conflicted in any way with those fixed by general laws then, if the proviso is to control, to the extent that they are inconsistent with those fixed by the general laws, they would be ineffective and void. If they did not so conflict with those fixed by the general laws, as we have said before, the charter provisions fixing said powers and duties, though valid, would simply amount to a re-enactment of that which was already the law—a mere superfluous or idle act. We do not think the framers of the amendment, nor the people of the state who ratified it, contemplated any such absurd result." (*Reuter, supra*, 220 Cal. at pp. 320-321.)

Then came the historical section of the opinion, where the *Reuter* court further supported its conclusion with the rule of "contemporary construction." (*Reuter, supra,* 220 Cal. at p. 322.) The court then went on for several pages about the fact that San Bernardino, Los Angeles, Butte, Alameda, and Sacramento, all charter counties, had within the ensuing decade of the ratification of Article XI, section 7 1/2, provided for powers and duties of various officers which were different from those prescribed by general law. (See *Reuter, supra,* 220 Cal. at pp. 322-324.) After that, the *Reuter* court only had to distinguish (and to some extent disapprove) *More v. Board of Supervisors* (1916) 31 Cal.App. 388 [160 P. 702], a tax limitation case, and add a paragraph to the effect that the basic purpose of Article XI, section 7 1/2 was to create a mechanism for "local self-government or county home rule," its main objective being " 'to place the local government of each county in the hands of its citizens.' " (*Reuter, supra,* 220 Cal. at pp. 325-326.) The conclusion of the opinion was that when the state Constitution was "construed as a whole" and given a "reasonable interpretation," the fact that the San Mateo charter had transferred the duty of road commissioners from the board of supervisors to the county engineer was "a valid and constitutional charter enactment." (*Id.* at p. 327.)

The trial court thus erred in its reading of the *Reuter* opinion. All that language about "idle and superfluous" acts simply morphed into a broad proposition that general law is *never allowed* to fix the powers and duties of the board of supervisors.

*Reuter*, however, never said that. It never even purported to say that. The opinion cannot be read for the idea that county charters cannot adopt state law for their own use. The court merely said that *if* a county charter provided for a set of "powers and duties" for its board of supervisors in direct conflict with general law, the charter, not general law, controlled. And that idea is hardly a revelation. (See *Dibb, supra,* 8 Cal.4th at p. 1216 ["The import of *Reuter* . . . is twofold. First, it establishes that powers and duties legitimately conferred by charter on county officers *supersede* general law."].)[8] The case is about an internal contradiction in the state Constitution, and in no way touches on whether a county has the *right*, if *it* so chooses, to adopt general state law in places where it sees fit.

Now let us address that latter point directly. There is absolutely nothing substantively inconsistent with Article XI, section 4—or even some platonic ideal of county home rule for that matter—in *deliberately* choosing to adopt

---

[8]Later, the *Dibb* court would also note that *Reuter* "sheds some light" on the power that can be conferred on a county official under subdivision (e) of section 4, namely it can include the power to bind the county by contract. (See *Dibb, supra,* 8 Cal.4th at p. 1216.)

large swaths of general state law as the county's own. If that is the county's choice, then that is the *county's* choice. As amicus curiae California State Association of Counties aptly puts it, "Diversity in the manner of local government is the essence of county 'home rule.' "

It is the same here. If the voters of a county choose to adopt the general law for the governance of their county government except in one particular area, maybe it is because they like the general law. When the trial court wrote that the incorporation by reference made the county "subservient" to the Legislature and was contrary to the "thrust" of home rule, it was essentially confusing intuitive rhetorical associations (e.g., "if we have home rule, we must have our own unique way of doing things") with the actual substance of what the county voters were doing ("we will have home rule, and we like the Legislature's rules so much that we hereby adopt them for ourselves, except for this one item").

Finally, even though Orange County's charter did not specify its own unique way of "providing for" most of the requirements of Article XI, section 4, the very fact that Orange County became a charter county actually facilitates home rule. In adopting Measure V, Orange County embarked on a charter form of government. This was a significant decision, because, in the future, problems will be processed through the framework of charter government, with the added legal flexibility which that will entail. If, for example, the Legislature changes a law in the future that affects county governance, the matter can be put to a vote of Orange County voters who will be able to determine for themselves whether they like the change made by the Legislature. *Without a charter*—which is the ultimate result plaintiffs urge upon the courts—county voters would not be able to make the change, and would be stuck with whatever the Legislature had prescribed (unless, of course, they wanted to begin the process of adopting an entire charter anew).

### V. *The Impartial Analysis Passes Constitutional Muster*

#### A. *Preliminary Considerations*

 Next we turn to a series of alleged deficiencies in the county counsel's impartial analysis that was part of the ballot materials in the March 2002 election. The trial judge noted a number of things which the analysis didn't say, or which he thought were inaccurate or misleading, in bolstering his decision to strike down Measure V.

We begin by noting the relevant chronology: Measure V was on the March 2002 ballot, and anyone who thought that the impartial analysis

provided with the ballot materials was somehow deficient might have made a *pre*election effort to cure any deficiency and thereby prevent any alleged misleading of the voters before it happened. (Cf. *Huntington Beach City Council v. Superior Court* (2002) 94 Cal.App.4th 1417 [115 Cal.Rptr.2d 439] [writ petition arguing over statements in ballot materials processed through trial and appellate courts prior to election].) Rather, the plaintiffs have made only a postelection attack on Measure V based on alleged deficiencies in the impartial analysis.

The structure for such an attack is outlined in *Horwath v. City of East Palo Alto* (1989) 212 Cal.App.3d 766 [261 Cal.Rptr. 108], a case involving a postelection challenge to a city rent control measure based on what were in that case clear deficiencies in the impartial analysis prepared by the city attorney. We will explain more of what happened below, but for the moment the important thing is that the *Horwath* court began its analysis by concluding there was no statutory basis in the Elections Code to attack the outcome of an election based on deficiencies in the impartial analysis. (See generally *id.* at pp. 773-775.)

However, the *Horwath* court went on to consider the merits of the argument that the deficiency in the impartial analysis might have reached "constitutional dimensions," as the appellants claimed there (see *Horwath v. City of East Palo Alto, supra,* 212 Cal.App.3d. at p. 773), eventually concluding that it hadn't.

Relatively recently, the scope of *Horwath* was considered by our high court in *Friends of Sierra Madre v. City of Sierra Madre* (2001) 25 Cal.4th 165 [105 Cal.Rptr.2d 214, 19 P.3d 567], (*Friends of Sierra Madre*) which involved a challenge to a ballot measure delisting certain buildings from a list of historic properties. The *Friends of Sierra Madre* court read *Horwath* to differentiate matters pre- and postelection, and basically observed that if you want to attack an impartial analysis, the preelection period is when you need to do it. We note the breadth of our high court's summary of *Horwath*: "More recently, in *Horwath* [citation] the court reached the same conclusion, holding that *the requirement that there be an impartial analysis of a ballot measure applied only to preelection activities. A failure of the city attorney to comply with the requirement was not a basis for a postelection contest* in which the petitioners contended that the process of enacting a ballot measure was so 'infected by official misinformation' that the legislation should be invalidated." (*Friends of Sierra Madre, supra,* 25 Cal.4th at p. 193, italics added.)

Plaintiffs in this case contend that they are not making an election contest of the March 2002 opinion, and therefore the fact that deficiencies in an

impartial analysis are not among the "exclusive" grounds to contest an election is irrelevant. They claim, as plaintiffs did in *Horwath*, that the alleged deficiencies in the impartial analysis here are a violation of constitutional guarantees of due process. As they put it in their brief, the right to vote is "fundamental in a democratic society" and the impartial analysis, "by conveying false and misleading information" abridged that right by preventing "voters from making an informed decision, especially given the paucity of other means by which to obtain accurate information in a low visibility election."

The argument requires some comment. First, plaintiffs' logic sweeps too broadly. Election losers frequently claim that their message "didn't get out" or that they were the victims of "false and misleading information." Simply as a matter of general principle, the idea that by "constitutionalizing" deficiencies in voter summaries you can undo an election is really quite antithetical to the democratic process.

Second, and more specific to the challenge here, it is not true that the inability to bring a postelection "contest" to a ballot measure is ipso facto irrelevant just because a party frames its challenge in the broad constitutional language of due process. Plaintiffs here have not considered the full implications of the *Friends of Sierra Madre* decision. That decision, interestingly enough, ultimately held that the measure being attacked was invalid because it was subject to the California Environmental Quality Act (CEQA, Pub. Resources Code, § 21000 et seq.), and in putting it on the ballot in the first place the city had not complied with the act. (See *Friends of Sierra Madre, supra*, 25 Cal.4th at p. 171 ["We conclude that CEQA compliance is required when a project is proposed and placed on the ballot by a public agency."].) Thus the court would say, "That plaintiffs here sought to set aside the election is not relevant." (*Id.* at p. 196.)

Even so, when the *Friends of Sierra Madre* court confronted the city's argument that a postelection challenge was not permitted by the Elections Code, the court agreed. (See *Friends of Sierra Madre, supra*, 25 Cal.4th at pp. 191-194.) The court explained for several pages that election contests are limited to " 'matters prescribed in the provisions enumerating the grounds of contest.' " (*Id.* at p. 194). The measure was struck down because the failure to comply with the CEQA statutes allowed a challenge "independent of the statutes governing election contests." (*Id.* at p. 192.)

It follows from *Friends of Sierra Madre*, when read together with *Horwath*, that the need to mount any challenges to an impartial analysis before

an election takes place and not after it cannot be so easily sidestepped as plaintiffs here would have us imagine. A litigant cannot simply intone the words "due process" and make the problem go away. Here, substantively, plaintiffs have really mounted only an election challenge, not a constitutional challenge (at least insofar as they attack the impartial analysis).

We need only add that in light of the fact that the *Legislature* has determined in the Election Code that an election cannot be undone on the basis of alleged deficiencies in an impartial analysis, trying to achieve the same result under the rubric of constitutional due process, as was unsuccessfully attempted in *Horwath*, requires a showing that the impartial analysis profoundly misled the electorate, not that it just didn't educate the electorate as to all the legal nuances of the measure. We perceive in *Friends of Sierra Madre* and *Horwath*, when read together, that the bar is very high indeed for a litigant to successfully mount a postelection challenge to a ballot measure using a due process rationale based on defects in a county counsel's impartial analysis. In *Horwath*, the litigants did not manage to clear that bar. Here, they barely even get off the ground.

### B. *Deputy Supervisors? Not in This Charter*

The trial judge pointed to two specific items where the county counsel's impartial analysis in the ballot materials failed to explain to the voters that powers were gained or lost on becoming a charter county. One was the right of noncharter counties to have nonelected district attorneys, sheriffs and assessors. (See Gov. Code, § 24009.) The trial court noted that to do so would conflict with subdivision (c) of Article XI, section 4, which requires charters to "provide for" *elected* district attorneys, sheriffs, and assessors. The other power affected was that members of the board of supervisors might one day have the ability to delegate duties to a deputy, something that presently can't happen in a noncharter county (see Gov. Code, § 24101). The court specifically noted that whether there were "other powers . . . lost or gained by the County in this attempted shift from [a] general law county to a charter county was not established at trial," which we will take to mean that those two items were the best plaintiffs could do.[9]

Let us take the easier of the two affected powers first, which is the one concerning the delegation of duties to a deputy supervisor. It may be, as an

[9] While the trial court was initially concerned with whether, in passing Measure V, Orange County had inadvertently repealed the county's term limits ordinance, he did not mention any such effect in his statement of decision. We do not address the issue now, except to note that both charter and noncharter counties are allowed, under general state law, to adopt term limits statutes. (See Gov. Code, § 25000, subd. (b) ["the board of supervisors of any general law or charter county may adopt or the residents of the county may propose, by initiative, a proposal

academic matter, that a charter could eventually provide for a board of supervisors each of whom could delegate duties to a deputy, but that is not what *this* charter provides. By incorporating state law which precludes such delegation, this charter simply kept the status quo. Thus it cannot reasonably be said that the voters were misled into voting for something of which they had no inkling as regards deputy supervisors. No deputy supervisors before Measure V, no deputy supervisors afterwards. And, if a county charter amendment is ever proposed to allow the supervisors to delegate duties to deputies, then, because that can only be done by a charter amendment,[10] the county counsel's statement that "[f]uture changes to the charter must be submitted to the voters for approval" was spot on accurate in that regard. So there was certainly no misleading as to the delegation right.

### C. Non-elected District Attorneys? Doesn't Affect the Core Purpose of the Legislation

The clash between the possibility of actually having a non-elected district attorney, sheriff and assessor—which *noncharter* counties can have, at least in theory—and the requirement that charters must provide for *elected* district attorneys, sheriffs and assessors, is somewhat more problematic. It arises because of the fact that subdivision (c) of Article XI, section 4 places a substantive restriction on county government beyond mere political structure. Subdivision (c) thus requires provision for not only a district attorney but an *elected* district attorney. (Ditto sheriffs and assessors.) A natural reading of the subdivision is that a county does not have the *option* of having a non-elected district attorney (not that anyone really wants one anyway—a point which we will soon address).

On the other hand, consider the impact of subdivision (h) of Article XI, section 4. The one-sentence subdivision states: "Charter counties shall have all the powers that are provided by this Constitution or by statute for counties." A natural reading of that subdivision is that a county should not lose any powers—"options" if you please—on becoming a charter county that it otherwise had by statute prior to becoming a charter county.

The question before us thus becomes whether the "failure" of the county counsel in his impartial analysis to spot the interesting legal possibility that by going to charter status county voters would lose the opportunity ever to

---

to limit or repeal a limit on the number of terms a member of the board of supervisors may serve . . . ."].)

[10]We will explore in more detail the problem of the Legislature changing the general law in part V.D., *post*, of this opinion.

have a *non-elected* district attorney, sheriff and assessor reaches a level where constitutional due process itself demands invalidation of the election.

The requirement that county counsel prepare "an impartial analysis of the measure" is found in Elections Code section 9160, subdivision (b). The first subdivision of that statute gives the governing language (the second and third deal with what happens when the entire text of the ballot measure is not printed on the ballot). It says: "The county counsel or district attorney shall prepare an impartial analysis of the measure showing the effect of the measure on the existing law and the operation of the measure. The analysis shall be printed preceding the arguments for and against the measure. *The analysis shall not exceed 500 words in length.*" (Italics added.)

It is obvious from the 500-word limitation in the statute that the county counsel is not required to write—indeed should not write—a law review article meditating on every last nuance and wrinkle posed by a ballot measure. Impartial analyses were not meant to be environmental impact reports. The 500-word limit poses the literary challenge of summarizing what might be a very complex measure into a report about the size of a small newspaper column. (Neither this court nor the trial court nor the attorneys' briefs filed in this court have attempted to describe the ballot measure, complete with all the various ramifications that bothered the trial court judge, in less than 500 words!) Thus it is no surprise that when the *Horwath* court confronted a constitutional attack on an impartial analysis, the court articulated a liberal rule. An impartial analysis will pass muster if it describes the measure in "general terms" giving its "key components." (See *Horwath v. City of East Palo Alto, supra,* 212 Cal.App.3d at p. 779.) Elsewhere other panels of the Court of Appeal have declared that all reasonable doubt should be resolved in favor of upholding the analysis. (See *Brennan v. Board of Supervisors* (1981) 125 Cal.App.3d 87, 96 [177 Cal.Rptr. 677] [if "reasonable minds may differ" on the "sufficiency" of a ballot summary, "it should be held sufficient"].)

Now to the actual facts in *Horwath*. There, the city attorney did a fairly bad job of describing a ballot measure—so much so that it really misled the voters in a significant way. On top of that the whole text of the ballot measure wasn't even on the ballot.

In *Horwath*, a city council voted to put a rent control ordinance before the voters. Right off the bat there was a mistake as to the nature of the rent control ordinance. The city council wanted to put a rent control ordinance which had a 1983 base year, but which allowed for inflation increases of 9

percent in 1984 and 8 percent in 1985. But the ordinance that was voted on by the voters set the base year in 1985, which in practical effect meant there would be an 8 percent *rollback*. (*Horwath v. City of East Palo Alto, supra*, 212 Cal.App.3d at p. 770.) To make matters worse, the voter information pamphlet didn't contain the actual text of the measure—voters had to write in and request a copy if they wanted to read it, and of course the rollback aspect of the measure wasn't obvious from what was in the information pamphlet. And neither the summary of the measure nor the city attorney's impartial analysis noted the rollback effect of the measure—the measure wasn't just freezing rents, it was forcing landlords to lower them. (See *id.* at pp. 770-771.) The measure won.

And yet, despite this comedy of errors, the measure survived scrutiny by the *Horwath* court, even though the landlord-plaintiffs argued that the "enacting process was so infected by official misinformation about a vital element" of the legislation that it had to be invalidated on due process grounds. (See *Horwath v. City of East Palo Alto, supra*, 212 Cal.App.3d at p. 773.) And on one point the landlords had a good argument: The court was compelled to conclude that the impartial analysis was so bad that there had been an actual violation of the statute requiring an impartial analysis (there, Elec. Code former § 5011, since this was a city, not a county; see *Horwath*, at p. 778 ["the analysis itself did not pass section 5011 muster"]).

However, even if there had been a violation, the new measure was valid. There had been some preelection publicity about the effect of the rollback and the city had made the full text available, free of charge, "*before* the election" so a voter could have spotted the implications of the base rent date himself (see *Horwath v. City of East Palo Alto, supra*, 212 Cal.App.3d at pp. 778-779). The bottom line was that there was no "material" irregularity affecting the election process because the impartial analysis "disclosed the purpose of Measure A and described in general terms its key components, except for the definition of lawful base rent." (*Id.* at p. 779.) Summing up, the court concluded that the rollback omission fell "somewhere in between a minimal defect and one going to the core character and purpose of the proposed legislation," yet, "in light of what was disclosed, coupled with the extent of pre-election publicity on the very topic of the rollback, as well as the availability of the full text of the proposed ordinance," the city's conduct was *not* "so egregious as to raise a presumption of unfairness." (*Ibid.*)

Let us compare the facts in *Horwath* with those before us here. In *Horwath*, the defect in the impartial analysis was palpable. The affected landlords were faced with a rollback that hadn't been officially brought to the voters' attention. Their pocketbooks would be affected and affected

immediately by the measure itself. Here, by contrast, the loss of the possibility of having non-elected district attorneys, sheriffs and assessors is almost ridiculously academic. Nobody, including these plaintiffs, burns with the desire to make Orange County's elected district attorney, sheriff and assessor into appointed positions.[11]

In *Horwath*, the defect in the impartial analysis actually misled voters as to the nature of the legislation. Ask any renter or landlord, and they will tell you there is a difference between freezing rent and rolling it back by 8 percent. That defect was severe enough to be at least a "minimal" defect in the *Horwath* court's eyes, because it could not be gainsaid that the analysis missed a major aspect (even if not quite the "core character and purpose") of the legislation. Here, it really cannot be said that the county counsel missed anything. Subdivision (h) of Article XI, section 4 provides that charter counties shall have "all the powers that are provided by this Constitution or by statute for counties." If, at some future time, there is some great movement in Orange County to have a non-elected district attorney, sheriff or assessor, then maybe the potential conflict between subdivision (c) of Article XI, section 4, and subdivision (h) of Article XI, section 4, can be litigated. That really would be the closest thing to a rerun of the *Reuter* case, but for the moment let us say, as a court, it isn't at all clear how such a future hypothetical case would turn out. It might even be (and such a result would be consistent with *Reuter*) that a court would declare that, even though Orange was a charter county, it still could have, pursuant to subdivision (h), a non-elected district attorney just like noncharter counties can have. Thus in contrast to *Horwath*, the impartial analysis here wasn't technically inaccurate.

In *Horwath*, as we have previously indicated, the complete text of the measure wasn't even on the ballot. Yet the court noted that any voter could obtain a copy. Here (perhaps owing to its remarkable brevity) the complete text was on the ballot. A hypothetical legally sophisticated voter thus had less "hassle" in figuring out the true import of Measure V here than of Measure A in *Horwath*.

Most importantly, in *Horwath*, the court was not willing to go so far as to say an 8 percent rollback went to the "core character and purpose of the

---

[11]There is only one difference between this case and *Horwath* which doesn't demonstrate how much less likely to mislead the voters the impartial analysis in this case is. In *Horwath* there was some preelection publicity (albeit not part of the *official* ballot materials) about the rollback. (See *Horwath v. City of East Palo Alto, supra*, 212 Cal.App.3d at p. 778 ["the responsibility for voter education is not the government's alone"].) Here, we accept the trial court's finding that Measure V was the product of a so-called low visibility election. However, to reiterate, the omission of the possibility of elected offices becoming appointed is so academic that it is clearly de minimis.

proposed legislation." (*Horwath v. City of East Palo Alto, supra,* 212 Cal.App.3d at p. 779.) Here, it is almost laughable to suggest that the hypothetical loss of the county's ability to turn certain elected positions into non-elected positions was even in the same continent as the legislation's core purpose—which was unabashedly to allow the voters, and not the Governor, to fill vacancies. Plaintiffs cannot maintain with a straight face that there is any political movement anywhere in this state that wants to take elected district attorney positions and turn them into non-elected positions, and there certainly isn't any evidence in the record that the loss of that possibility would have made any difference to the electorate.

### D. *A Charter Pegged to State Law? That Was Pretty Obvious*

The final deficiency identified by the trial judge in the impartial analysis was more general. He concluded that the impartial analysis failed to tell the voters that "every time the legislature changes the general law (except for the number of supervisors, their 4 year term of office and the filling of vacancies on the board of supervisors) that the charter would be changed without Orange County voter approval."

There are several answers to this theory. First, we cannot agree that this alleged failure even reached the level of a "minimal defect" in the impartial analysis as required by Elections Code section 9160. Assuming for the moment that the trial judge's characterization was correct (i.e., that the charter automatically changes or "floats" with state law), the average voter of even a rudimentary education can figure out that if the charter adopts general laws as set forth by the Legislature—and that was plainly in the text of the charter—those laws are going to change. (Cf. *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 243-244 (*Amador Valley*) [149 Cal.Rptr. 239, 583 P.2d 1281] [in construing Proposition 13, court assumed that the voters " 'voted intelligently' " and " 'duly considered' " the amendment " 'to their organic law' "]; *People v. Superior Court* (*Gevorgyan*) (2001) 91 Cal.App.4th 602, 610 [110 Cal.Rptr.2d 668] ["The drafters of an initiative and the voters who enacted it are presumed to have been aware of the existing statutory law and its judicial construction."].) That's what Legislatures do. They pass new legislation. They change old legislation. So when the impartial analysis plainly told the voters that the charter would not affect the general laws of the state (other than the way vacancies in the board of supervisors were filled), it was accurate.

Put another way, plaintiffs' argument fails because it is built on sterile semantics: One can just as easily say, with total consistency with the county

counsel's analysis, that by enacting a charter which incorporated general law, the voters decided to enact all the changes the Legislature might make in the future (except, of course, in relation to the filling of vacancies). Moreover, there are the implications of the *De Shields* and *Cline* cases which we have already discussed. The Supreme Court thought it insignificant that general law—with its possibility of future change—be inserted where the county charter had omitted some provision which the Constitution had otherwise required.

Further, as we have mentioned above, by enacting the charter, the voters of the county were indeed acquiring the power to change what the Legislature did if it changed county governance statutes in the future. In that situation, county voters could simply amend their charter to provide for a result different from that determined by the Legislature, and so would not be without recourse if there were some point of the general law (which, of course, we must add, it is "competent" for a county charter to deviate from) that they disliked. Thus, when the impartial analysis said that "[f]uture changes to the charter must be submitted to the voters for approval," it was substantively accurate: The voters would take pot luck with the general law, but if they wanted to change that, that change would be submitted to them for approval.

And, even if we assume that the failure of the 500-word impartial analysis to explore in detail the interesting logical ramifications of the charter's structure was a defect, it was clearly not one that went to the "core character and purpose of the proposed legislation." (*Horwath v. City of East Palo Alto, supra*, 212 Cal.App.3d at p. 799; cf. *Amador Valley, supra*, 22 Cal.3d at p. 243 [though title and summary of Prop. 13 prepared by Attorney General were "technically imprecise," court doubted "that any significant number of petition signers or voters were misled thereby"].) In fact, on that point, this charter amendment was probably one of the most honestly presented and described that has ever been adopted by the voters of any county. Because of the focus on one specific deviation from the general law, the voters could be reasonably certain that (with the exception, of course, of the very fact of becoming a charter county in the first place) the status quo would be maintained—including the fact that the Legislature might make a new law affecting county government—both before and after the change except for the deviation.[12] That is a far "cleaner" product than is presented to the voters when they are given a custom-made charter to vote on, in which any number

---

[12]With the exception of the loss of the power to make elected positions non-elected, which is why we belabored that loss in the previous section.

of unexpected changes requiring more than 500 words to explain are presented to them.[13]

### VI. *There Was No Need for a Fiscal Impact Statement*

■ A final point urged by plaintiffs to invalidate the charter, although not relied on by the trial judge, is that there should have been a fiscal impact statement as well as an impartial analysis. (There is a special irony here: If plaintiffs succeeded in overturning the measure on its failure to include a fiscal impact statement, their very litigation would have the effect of largely wasting the money which they now argue that the voters should have been told that the election would cost!)

In contrast to the other issues raised by plaintiffs, this one need not detain us long. First, if, as explained above under *Friends of Sierra Madre* and *Horwath*, deficiencies in a *required* impartial impact analysis cannot be the basis of a postelection attempt to contest the election, a fortiori the absence of an optional fiscal impact analysis cannot be the basis for such a postelection challenge. Again, to reiterate: If your complaint is with the ballot materials that go to the voters, challenge *those*, when you get the chance, don't try to overturn the election results by picking them apart afterwards.

And second, the presence of a fiscal impact statement is discretionary. Like the impartial analysis, provision for it is found in Elections Code section 9160, specifically subdivision (c). However, in contrast to the impartial analysis, it is a "may," not a "shall." After a series of "shalls" in subdivisions (a) ("shall transmit a copy of the measure to the county auditor") and (b) ("shall prepare an impartial analysis," "[t]he analysis shall be printed," "there shall be printed"), subdivision (c)'s "may" sticks out: "Not later than 88 days prior to an election that includes a county ballot measure, the board of supervisors may direct the county auditor to review the measure and determine whether the substance thereof, if adopted, would affect the revenues or expenditures of the county." And if the board does that, the auditor "shall" prepare the fiscal impact statement.

Given that the use of the word "may" denotes discretionary authority (e.g., *Bohemian Club v. Fair Employment & Housing Com.* (1986) 187 Cal.App.3d

---

[13]There is no need to explore in this opinion now whether, in the future, the charter should be construed as necessarily adopting general law as it stood in March 2002 or as changed by a future Legislature. (Cf. *Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 59-60 [195 P.2d 1] [duty of courts to construe a statute so as to save its constitutionality if it is susceptible of two constructions required court to interpret statute as incorporating the "then-existing" provisions of a certain treaty incorporated by reference into the statute when it was passed even though the treaty had been abrogated in the interim].)

1, 23 [231 Cal.Rptr. 769]; *Fair v. Hernandez* (1981) 116 Cal.App.3d 868, 876 [172 Cal.Rptr. 379]), it is relatively clear here that the board of supervisors' decision not to refer Measure V out for a fiscal impact statement was within the realm of reason. For one thing, it is pretty obvious to anybody that if a measure requires an election, it is going to add the cost of the election. Anybody can figure that out, even if he or she has no idea of how much putting on a special election might cost in a given county. Moreover, a fiscal impact statement would presumably also compare the cost of an election with the cost of the appointment process used by the Governor, including the cost of expensive background checks. Beyond the cost of elections, however, it is hard to see the measure having much fiscal impact; it does not contemplate any necessarily continuing expenditures, or hiring anybody who would otherwise not be on the county's payroll (though it might make a difference as to *who* is on that payroll in the office of supervisor).

## VII. *Disposition*

The judgment of the trial court holding that Measure V is invalid is reversed. The case is remanded with directions to enter judgment declaring that the measure is valid.

Because of the unique complexity of the issues, in the interests of justice each side shall bear its own costs on appeal.

Rylaarsdam, J., and Moore, J., concurred.

A petition for a rehearing was denied April 2, 2003, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied June 11, 2003.